You may proceed. Good afternoon. May I please the Court? My name is Jonathan Brush, and I represent the appellants, the lawyers, the commissioners, the marshals, and associates. In my time before the Court today, I will be discussing Mr. Marshall's entitlement to state law immunity to the tortious interference claim and fatal legal deficiencies in the RICO claim. Ms. Contreras, who represents the board members and the court, will be speaking to the Court regarding cause of action. Let me just clear it up, because this might help you devote your time. Why is the RICO claim even at issue? As I understand it, they won on both tortious interference and RICO. They elected tortious interference damages because they got the punitives. And Judge Ellison entered judgment only on the tortious interference. So, I mean, we only review a final judgment, which was entered solely on the tortious interference. So I don't see why RICO is at issue at all. RICO would be at issue, Your Honor, in the event and when the Court strikes down the tortious interference judgment. Judge Ellison also wrote on the RICO claim as an alternative basis for the judgment in the interest of judicial economy. So if the Court strikes the tortious interference, he has his findings on the RICO claim. And so in his opinion on the renewed motion for judgment is not at issue. But the final judgment, you agree, is just on tortious interference? Currently, Your Honor, yes. Okay. I mean, I had this issue in a RICO case a few years ago. We actually said you have to remand, reenter judgment on the other claims. And then it would inefficiently, as you say, come back up. But anyway, you can go ahead with your argument. Fair enough. Turning right to the tortious interference claim, Your Honor, this case comes to the Court not from a clean slate, but from the first opinion from this Court where the prior panel in addressing what it identified as a novel question of Texas law, whether or not Mr. Marshall was entitled to governmental immunity and professional immunity from suit, made an eerie guess. Subsequent authority from the Texas Supreme Court tells us it made an eerie guess. The Court on the prior appeal found that Mr. Marshall was not entitled to immunity because he was alleged to have acted wholly outside the scope of his duties as an elected trustee. Since that case was decided, the Texas Supreme Court has clarified that the test, and this is the Lavery case, is an objective test that looks to whether or not the governmental employee is taking some action that is within or incident to the scope of his duties. When this case was tried, Judge Ellison charged the jury that in order to hold Mr. Marshall liable for tortious interference, the plaintiffs would have to demonstrate that he had taken an official act that caused harm to the Gil Ramirez Group. Necessarily, an official act is squarely within the scope of Mr. Marshall's duties. He was acting, and in order to hold him liable, he had to have taken an official act. He had to have done something that was squarely within the scope of his job duties. That entitles Mr. Marshall to immunity under state law to the tortious interference claim. He's entitled to governmental immunity. There is no contrary case law other than the prior opinion of this Court, which made an incorrect ruling against him. Given that fact, the case never should have gone to trial on the tortious interference claim against Mr. Marshall. It seems to me that so much of this is a matter of phrasing, and we're trying to figure out what's the most reasonable way that if Texas was presented this, would they phrase the issue. And one way to phrase the issue is, is it ever within the duties of a public official to act pursuant to bribes. And that's what's been found here. And if that's what the Supreme Court, you know, I don't think that's necessarily even a caveat to what they said, however you pronounce the name, Laverie or whatever. What makes it such a firm decision in your mind that some sort of, well, we were only considering what was presented to us, and there definitely would not be within the official duties to respond to bribes, to act on the basis of bribes. To act on the basis of bribes. And so, Your Honor, with respect to that question, obviously taking bribes, if a governmental official is doing that, is not something they should be doing. It's not their official duty per se to take a bribe. Now the Supreme Court in McDonald put a layer on top of what is a bribe and essentially blessed influence via sale and influence peddling. But more importantly for the tortious interference claim, Your Honor, this is a state law claim. It's a state law tort claim, and the Texas legislature and the Texas Supreme Court get to define whether or not there's a remedy. And with respect to Mr. Marshall as a governmental employee, there is no civil remedy for tortious interference if there is any connection at all to his duties, to his official actions. It doesn't have to be that every action he took was squarely within his duties. It just has to be incident to. And here we know that the gravamen of their entire complaint is the allegation that Mr. Marshall sold a vote. He had to be an employee. He had to take an action to vote, which is the essence of his duties. The Texas legislature has made clear that there's simply no civil action available against a school district employee such as Mr. Marshall under those circumstances. And so whether or not it's a question of is it right or wrong, it's a question of immunity. And in this instance, the immunity question is quite clear on the state law claim that he can't be held liable for an action that touches his official duties. And we know that – Well, if he's immune, is the school district liable? Pardon me, Your Honor? If he is immune, does – is his employer subject to liability, that is, the school district? No, Your Honor, because under Texas law, the employer would only be liable in tort for a tort that stems from the use or operation of a motor vehicle. In essence, Texas law provides the greatest possible tort immunity to school districts and school district employees. And that's just a policy choice of the state of Texas. And when this court initially analyzed this case and made an eerie guess without the benefit of the Texas Supreme Court's opinion, it made the wrong guess. And because of that, the opinion or the judgment against Mr. Marshall on tortious interference falls under immunity grounds. It falls under the grounds that he was entitled to election of remedies. It falls under the grounds that he was entitled to professional immunity. And it falls under the grounds that the Ramirez group's undisputed failure to exhaust administrative remedies. I would like to turn to the RICO claim, recognizing, Judge Costa, your point about where the judgment is. But I do want to discuss it, at least with the court, because if the court were to, and when the court strikes the tortious interference judgment, we're left with the RICO claim. And really the essence of this claim and the problem is, as Judge Ellison recognized, it's a claim that gave the court great pause because of the continuity requirement. RICO, as the court knows, is designed to strike at long-term, ongoing, organized crime. Both this court and the Malvina decision, the Seventh Circuit and the Empress Joliet case, have all held that RICO was never designed to create a civil action, to create a criminal liability on one-off claims. Small theories of organized crime, short time, shortened scope, and short victims. And that's on the closed-ended – why isn't this an open-ended case? Because, I mean, the allegations, at least the jury bought into it in large part, was that this is basically the way Marshall was conducting business with all types of contractors at HISD. And so with respect to an open-ended theory of continuity, Your Honor, I think the Seventh Circuit did this the best. As pled and as tried to the jury, this was a case where Mr. Marshall was allegedly steering the award of job-owner contracts. And while the jury heard extensive evidence of other contracts and other types of HISD contract powers, again, the court charged the jury on each of the RICO claims that they could only consider alleged predicate acts related to the two separate competing allegedly criminal enterprises they identified. As master of their own complaint, the plaintiff identified a Fort Bend mechanical alleged criminal enterprise and an RHJ enterprise. They were charged to the jury separately, and the jury was cautioned and told that they could only consider predicate acts related to each of those enterprises. And where this court case ultimately collapses for the plaintiff is when you look at the predicate acts, the court charged them on one bribery. And so you would have a one-off bribery. This is a scheme of one bribe at most, and it's a one-off crime at most. And as the Seventh Circuit recognized, you can't get to an open-ended continuity in the Empress Joliet case because there's no guarantee that there would be another job program that would come up for vote that would implicate these two schemes. And there's no guarantee that Mr. Marshall would remain on the board. And so in the Empress Joliet case, the Seventh Circuit expressly rejected a finding of open-ended continuity, noting that there was no guarantee that Governor Blagojevich would win re-election. When do you judge open-ended? By the time the complaint's filed or the time the verdict's reached? So in terms of even at the time the complaint was filed, Your Honor, which I think is when you have your injury or injury accrual, judging it at that point, it's still speculative whether or not Mr. Marshall would have remained on the board or whether or not there ever would have been another job contract. And critically important, bringing it all back around, all that was left of the Repo claim after the first appeal was the narrow window in time from August 2009 until the end of the 2008 job period in January 2010 because this court held that the Ramirez group lacked standing to complain of anything in the future. So by definition, I don't think we could ever get to an open-ended continuity based upon what was left alive in the first appeal in this case. With that, I see I'm nearly out of time. Hi. May it please the court, my name is Susan Contreras and I represent Fort Bend Mechanical, FBM Management, and David Medford. I'm going to address mostly causation, lack of proximate cause in the tortious interference claim. Tortious interference requires proximate cause and there was absolutely no evidence offered at the trial to show proximate cause with respect to my client. And one thing I wanted to mention first is even if this court determines that you can't use the legal sufficiency challenge because of the fact that he failed to file in time, we can use the plain error rule and that would be sufficient because there was no evidence at all to support the jury verdict here with regards to proximate cause. I'm going to start first with the 2008-2009 procurement. First of all, there was absolutely no evidence that my clients caused harm to the Pelleys. He alleged no jobs that were lost to Fort Bend Mechanical. He only offered evidence that the decline in volume of work was due to RHJ being added as a contractor and the evidence actually showed that the Pelleys were significantly more successful than Fort Bend Mechanical during the contract period. The profits were actually almost a half a million dollars more than Fort Bend Mechanical. So there's no way that Fort Bend Mechanical could have caused any damages if his actual profits were a lot lower. And also, all the allegations were related to RHJ being added and the fact that that was a little bit suspicious, but Fort Bend Mechanical had absolutely nothing to do with that. So there's no connection between Fort Bend Mechanical and the damages in the 2008-2009 procurement. For the 2010 procurement, there was also no evidence shown that my clients proximately caused his damages. It's basically a complete impossibility that the Pelleys could have been chosen and awarded a contract in 2010 and it really had nothing to do with my client at all. The committee ranked each contractor and in that rankings, Pelleys finished 10th in the rankings. And as this court noted in its prior opinion, the reason was actually due to not being competitively priced among other reasons. And there's actually no evidence offered at the trial that Marshall had any influence over this ranking process. It was a separate process that occurred prior to the trustee getting involved. The board then approved the committee's recommendations with a 7-1 vote and no evidence was offered that my client was bribing any of the other members of the board. So even if the top four contractors, say, were removed from the procurement, the Pelleys would not have been selected at all because they would not have remained in the top four. They would have maybe been in the top 10 or so. They were just simply too low in the rankings from the initial ranking process for my client to have caused any sort of damage to them having not been selected. I wanted to also address the tape that was brought into the evidence at trial. I want to mention that there were some comments made by my client in the tape that were not great. It didn't make him look very good, but there was no evidence offered by that tape that showed that he approximately caused any of the injuries. So I just wanted to mention that as well. I kind of wanted to address, too, if you don't mind, the… But isn't the whole point of why the bribes that the jury found were being paid to Marshall, taking him to the Super Bowl, things like that, it was to prevent other contractors from getting the contracts? I mean, allegedly, there may be some issues that other contractors…or some issues as far as, like, that he maybe had made those bribes, but it didn't affect this contractor because his rankings were too low and therefore he could not have been hired even if my client had not done it. Whatever harm your client did, it wasn't against this plaintiff? I'm sorry? Whatever harm your client did, it did not injure this plaintiff? Is that your basic point? Right. Anything else? Yes, I'd like to address, again, mentioning the RICO claim, even though it's not in this case at the moment. The court had – he touched on it briefly, but the court had specifically remanded this case only limiting to the 2009 job period, and the case went to court and went to trial on both the 2009 and the 2010 period. So if this were to be remanded back to trial, it needs to be clarified, I suppose, that it's only the 2009. Any award against the clients for any RICO claim that allegedly occurred in the 2010 can't stand. This court had already, like I want to mention, it stated in its opinion prior that it wouldn't have been chosen in the – the appellees wouldn't have been chosen in the 2010 selection but for corruption. And they did not offer any new evidence at trial that showed otherwise. So basically, just to conclude, they were just ranked too low in 2010 to have been selected. All right, counsel. Any questions? Thank you. Are these your three-ring binder materials? They may be happy to use them, I don't know. Good afternoon, Your Honors, and may it please the court. My name is Danielle Lang and I represent Gil Ramirez Group, the appellee in this matter. At its heart, this is a case about whether or not public officials can ever be held accountable for blatant pay-to-play schemes that line our pockets to the detriment of the public trust. And this court should affirm the jury's well-supported verdict condemning this scheme to defraud the Houston Independent School District community. Marshall's lawyer primarily focuses on saying that this type of activity, bribery basically in whole, is immune under Texas state law. That's simply not the case. And first and foremost, this court in this case has already held that that's not true. This court in this case already held that bribe-taking like Mr. Marshall was engaged in is, quote, wholly outside the legitimate scope of a trustee's duties. But doesn't Texas get to say we're wrong if that's what they said? Your Honor, that may be the case if that is what they said. Well, isn't it the case? Aren't we interpreting state law? Yes, Your Honor. So that would be the case, yes? That would be the case except for that Lavery did nothing of the sort. But it didn't say the opposite either, didn't it? You just have to work with that opinion. It didn't really address what's before us. Yeah, of course not. The factual circumstances here were not before us. So this court, just as the prior court, would need to apply longstanding Texas law about the scope of employment. But Lavery didn't provide any seed change whatsoever. In fact, Lavery said itself that it was, you know, providing, applying longstanding Texas approach. So the same approach applied to Lavery as to cases before that the previous panel would have decided. There is no case under Texas law that says bribery takes you outside you, the public official, outside of your official duties. To my knowledge, there's no case one way or another that says bribery is or is not covered by immunity. But I think that the panel before made the right judgment that there would be no reason why the state would want to immunize bribery. And that kind of activity. And I think it's important also to note that the evidence in this case was about a single vote that maybe arguably was within the scope of his duties. In fact, Marshall was engaged in a whole series of activities that there was no way were part of his official duties. He was setting up LLCs with consulting companies so he could accept his bribes. He was meeting with contractors on the side to make agreements about bribes. He was accepting bribes. He was making agreements about what he would do for bribes. And Superintendent Abe Saavedra testified that it is entirely outside of a trustee's role to be talking to HISD administration officials about bribes. Was it your position that nothing has happened in Texas law since this first case and now? That's absolutely right, Your Honor. Lavery started out by saying it was applying the same analysis that it has always applied to scope of employment. So there's been no change whatsoever. No reason to disrupt the first panel's decision here, which correctly applied Texas state law. Lavery is a case about defamation that happened during a hiring process in which the dean, part of her job was to say what she believed about the plaintiff, and she did that. So the question is, was Defendant Marshall doing his job when he took these bribes and then when he acted on those bribes, when he walked over to the administration office and was pressuring Dick Lindsey, Melinda Garrett, Superintendent Abe Saavedra, all of these HISD administration officials who were involved in the public contracting process, there was evidence in this case that there was no reason trustees should have been doing that whatsoever. They're not supposed to be involved in that kind of decision-making. And yet Marshall testified himself that when Defendant Contractor R.H.J. came to him and was concerned about wanting to get this HISD contract, he went over and talked to Melinda Garrett, who was in charge of this process, and he asked her to help out R.H.J., and she did. That's what Mr. Marshall testified to. There's no way that him walking over to Melinda Garrett's office and asking her to make sure that R.H.J. would be added to the contractors for HISD was in any way within the scope of his trustees' duties. There just is a difference. I mean, there's an elegance to the argument that, oh, because he was doing something official, it must have been within the scope of his employment. But they're just two different inquiries, right? One is about, is this bribery? Because if you're not using your official power, well, then it's not bribery. You can pay me to try to influence people, and that's fine as long as I'm not doing it in my official capacity. And the second is whether or not you're furthering the responsibilities of your job, whether or not you're doing your job as trustee. So yes, Marshall was using his official power and clout that he developed over decades in the district to provide his salary through pay-to-play kickbacks. But no, he was not doing his job, and he was not furthering his job responsibilities when he did it. And so once you kind of take out the scope of employment argument, I think that all the rest of the challenges to tortious interference largely fall away. The argument about exhaustion, about a cap on damages, about election of remedies, about professional immunity, they all rise and fall with this scope of employment question. What about Fort Bend's argument that there's no causation for its actions because your client wouldn't have gotten these contracts anyway? I think it's important with respect to that question as well to look at what the panel has already decided in this case previously because I think it speaks to exactly that issue. First, the panel in this case previously held that the drop-off in the total volume of work that was going to GRD during that 2009 period towards the end of his contract may have been part of the entire scheme. And, in fact, it was, and that's what we argued to the jury, and that is what the jury found. And later in the opinion, the court held correctly that the nature of the alleged bribery scheme was to fix the contracting process in favor of the vendor defendants. That includes Defendant Medford, right? And so where only a limited number of contractors are going to get the work, all the participants were part of the scheme to deprive those who were not part of the scheme of the work. The way a pay-to-play scheme works is that everybody has to pay. If contractors like Medford and RHJ know that Gil Ramirez's group can get work without paying, why would they have any reason to pay whatsoever? So is everyone above Gil Ramirez on that ranking part of the pay-to-play scheme? Oh, well, so let's – I'd like to answer your question in two parts, which has to do with the 2009 section and then the 2010 section. With respect to 2009, I think there's every reason to believe that the evidence showed that there was a complete drop-off in the work after a few things happened, right? RHJ insisted on getting itself added, and Marshall made sure that that happened. Gil Ramirez's group was approached and asked to start paying the bribes, and he refused to do so. And as a result, all of a sudden all the work dried up, and we decided we needed to have a new rebid, and we pulled the decision. There was previously an agenda item to say, oh, we're going to renew all these contracts. Marshall pulled that agenda item. Instead, he had his friend write an audit saying, oh, I think we need a whole new process, et cetera. And so Medford, of course, was part and parcel of the scheme that led to that drop-off in work to say we're going to stop this process in its tracks because somebody is making a lot more money that isn't paying into the scheme. And so with respect to the 2009 damages up through May 2010, I think there's no question that Medford was part of a scheme that approximately caused those damages and stopped all of that work in its tracks. Then there's the question of May 2010 on. With respect to May 2010 on, the prior panel clearly held that they thought it was very possible that the entire 2010 process could be indicted as manipulable and created as a reason to get rid of Gil Romero's groups and others that were not paying. Much of Medford's argument relies on the idea that the rankings themselves were not corrupted. And the evidence sent to the jury was to the contrary, right? That Defendant Marshall had insinuated himself into every part of this process. An individual named Mr. Pottinger, who was in charge of the procurement process, sat on the stand and said that Marshall had insinuated himself in this process and that he was pressuring HISD officials to make sure that somehow, one way or another, his preferred contractors ended up at the top of this list. And it wouldn't be surprising, also, that he would want to make sure that GRG, who refused to pay a bribe, was asked to start paying and refused to do so, would end up towards the bottom of that list. So yeah, was GRG at the bottom of that list? And if that list was followed, would he have not gotten his contract? That's absolutely true. The question is whether or not there would have ever been a 2010 redo if not for this corruption scheme, and whether or not GRG would have landed at number 10 if not for this corruption scheme. And that evidence was put to the jury. There was overwhelming evidence about manipulation of the job contracting process. And the jury held that the process was manipulated and that without the actions of Marshall, there probably would have just been a renewal in 2010, and that's how they found the damages in 2010. So I think the proximate causation argument all relies on an assertion throughout the briefs that there was no evidence that Marshall was manipulating this process. I think that's a real insult to the jury who sat through three weeks of evidence and dozens of witnesses who went out to the contrary, heard from superintendents and HISD officials and from Defendant Medford himself in recorded statements and heard from Defendant Marshall himself where he said, in one of the most striking moments of the trial, Defendant Marshall testified that he believed that the board would, quote, vote for Larry Marshall if he wanted something done. He was asked, you know, shouldn't you have disclosed that you were making money from RHJ and FBM and all these contractors? Wasn't it required that you disclose all this information? And if you had disclosed it, would that have given your fellow board members pause about approving these contracts? And he said, no, they would vote for Larry Marshall. And so Mr. Marshall knew the power that he had over the board, over HISD officials, and he used it to pay his salary for years. These payments were some of the only income reported on Mr. Marshall's tax returns for years. Years and years and years. So he had every reason to deliver on his promises to contractors because they were paying his bills. They were keeping the lights on. I'd like to move on and talk a little bit about kind of the myriad of additional defenses that have been raised in this case, although not discussed yet, during oral argument. One of them, and one that I find most troubling, is the invocation of McDonnell v. United States. McDonnell v. United States was a recent bribery case from the Supreme Court, and it was about jury instruction. It was about the jury instruction for the federal bribery statute, so a different statute, and it was a case about kind of access and influence allegations, right? I mean, I went back and reread the case this morning, and the only allegations of official acts that took place there was the setting up of meetings, making phone calls to introduce people. In fact, it wasn't even very successful, and those were the only allegations in that case. The quo and the quid pro quo was I'll introduce you to some people, I'll sit you next to the governor, I'll set up a meeting where you can discuss this issue that you care about with the people who make the decisions about it. There just aren't any allegations like that in this case. I mean, Marshall never even suggests or points out a time where GRG has focused on access or influence. I'm not sure that Medford ever had any meetings in particular, or the defendant contractors like Medford or RHJ even had meetings with the relevant HISD officials. Instead, it was kind of the iron hand of Defendant Marshall saying you will do this or you will lose your job. Superintendent Saavedra testified that he believed he lost his job because he wouldn't back one of Marshall's favorite contractors. So he knew that he was supposed to be supporting RHJ because that was Marshall's favorite contractor, but he didn't believe that that would be the right thing to do. There were all sorts of issues with RHJ. RHJ hadn't won fair and square. He found himself out of a job. There was testimony from the early 2000s from an assistant superintendent who was told, you should put this contractor who I'm consulting for up to the front for all health insurance for HISD employees. He refused to do so. He found himself out of a job. So this is not a case about access and influence and glad-handing where the Supreme Court had some concern that politicians would always be looking over their back. Can I have this meeting? Can I not? I think that it's very clear that politicians would understand that they couldn't engage in this kind of explicit bribe-taking month after month after month in exchange for lucrative contracts that he would deliver on a regular basis. And Marshall lost those payments when he didn't deliver. So defendant contractor RHJ didn't originally get her contract that she wanted in 2008. She stopped paying. And all of a sudden, defendant Marshall kicked into high gear, going over to the HISD administration office to make sure that that got changed. And as soon as she was added, two days later, she started making her payments again to Joyce Moss Clay, his associate. So I just don't think that McDonnell has any place in this case. And, in fact, McDonnell said that exertion of pressure on officials is exactly the type of thing that should be inside the bribery statute, whereas access, influence, having a meeting should fall outside. There might be some fuzziness at the margins. That's not this case. Anything further for us? No, Your Honor. I would just say that I think it's really important that we uphold the jury's verdict here. It's really well supported by all of the evidence. And to do anything otherwise would be sending a message to Texas officials and to Texas contractors who want to do business with Texas that if they want to do business with Texas, then they better open up their pocketbooks. And that is to the detriment of all of the public trust. Thank you, Your Honor. All right, counsel. You didn't save a lot of time, but you saved a little. I saved very little, so I'll try and use it wisely. Judge Costa, I don't think you ever got an answer to your question. No, there was no evidence that showed that all of the other contractors that ranked in front of the Gil Ramirez Group were allegedly involved in a pay-to-play scheme. What's more, and it's interesting because we've never quite agreed on what this court held in the first opinion, even factually, to hear the presentation of the audit, that the audit was a sham. This court observed that Gil Ramirez Group failed to raise a fact question as to whether or not the audit, the initial RFP was tainted, and it was tainted in favor of Gil Ramirez Group, which was eliminated from the initial selection and only found its way in later. It was an illegal procurement. It was buoyed under Texas law. This court recognized that initial RFP was tainted, not in a way that benefited RHJ or 4-pen mechanical. So it's interesting that they would come up here and suggest to this court that they had shown that the audit was flawed. They couldn't. This court had already said they couldn't. Moving on to the Lavery question, the Texas Supreme Court does not take cases to merely remind everybody that this is established agency law. They took the Lavery case to apply principles of agency law to clarify the election of remedies doctrine because the lower courts were getting it wrong. They had done exactly what this court had done, which was look to the motivation, look to the subjective intent of the public employee, and say if you have a bad motive, if you have animus, you're outside the course and scope. The Texas Supreme Court told us in no uncertain words that's the wrong analysis. This court picked it up in the Wilkerson case at the end of 2017 where Judge Higginson wrote, we don't narrowly construe the immunity statute, we construe it broadly. It's going to swallow almost all claims, and that's a decision that the state of Texas gets to make. They made that decision, and this court just needs to apply settled immunity law. Finally, with respect to the allegations of what's an official act or not, McDonnell tells us that meeting with constituents, advocating on behalf of constituents are part of the core public duties of an elected official. It's protected First Amendment conduct for the official and the constituent. This court should reverse and render judgment in favor of all elements. All right, counsel. Thank all of you for helping us with this case today and the others who have made presentations. That is it for today's docket. We will be in recess until tomorrow afternoon at 1 o'clock.